UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Rachell Logan Abstance, | ) | C/A No. 5:21-4104-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi, Acting Commissioner of Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying

her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")

pursuant to the Social Security Act ("the Act"). Having carefully considered the parties'

submissions and the applicable law, the court reverses and remands the Commissioner's decision

for the reasons discussed herein.

I.   Relevant Background

A.      Procedural History

On December 23, 2019,[1] Plaintiff protectively applied for DIB and SSI under Title II and

Title XVI of the Act. Tr. 241-50. She alleged a disability onset date of December 11, 2019. Tr.

241. Plaintiff's applications were denied initially, Tr. 146-47, and upon reconsideration, Tr. 176-

---

[1] Although the Application Summaries are dated January 17, 2020, as noted in the Disability Determination and Transmittals, Plaintiff's protected filing date is December 23, 2019. Tr. 146-47.

77, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 202-03. The administrative hearing was held on February 16, 2021, Tr. 30-58, and on March 16, 2021, the ALJ issued an unfavorable decision, finding Plaintiff not disabled within the meaning of the Act, Tr. 9-24. Plaintiff requested review of the ALJ's decision, Tr. 236-39, and on October 19, 2021, the Appeals Council denied Plaintiff's request for review, Tr. 1-5. Thus, the ALJ's decision became final decision of the Commissioner. Tr. 1. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on December 21, 2021. ECF No. 1.

B.     Plaintiff's Background

Plaintiff was born December 27, 1975, and just shy of her 44th birthday as of her alleged onset date of December 11, 2019. Tr. 263. In her January 17, 2020 form Disability Report-Adult, Plaintiff indicated that she completed the twelfth grade, did not attend special education classes, and had not completed any type of specialized job training, trade or vocational school. Tr. 268. She noted her past relevant work ("PRW") included working as a factory invoice specialist (2004-2008), home cleaning person (2011-2014), and restaurant driver (2019). *Id.* Plaintiff indicated that she stopped working on December 19, 2019 because of her conditions which she listed as sensory polyneuropathy, bulging disk, PDA[2], PTSD, spinal stenosis, cataracts, and migraine headaches. Tr. 267. Plaintiff indicated that she is 5'3" tall, weighed 190 pounds, and her conditions caused her pain or other symptoms. *Id.*

In a Disability Report-Appeal dated July 14, 2020, Plaintiff indicated that her medical

---

[2] Although Plaintiff lists "PDA" as a medical condition, based on her hearing testimony this is a scrivener's error and the condition should be "PBA." Tr. 39. "Pseudobulbar affect (PBA) is a condition that's characterized by episodes of sudden uncontrollable and inappropriate laughing or crying. Pseudobulbar affect typically occurs in people with certain neurological conditions or injuries, which might affect the way the brain controls emotion." *See* https://www.mayoclinic.org/diseases-conditions/pseudobulbar-affect/symptoms-causes/syc-20353737 (last visited Jan. 13, 2023).

condition had changed in May 2020. Tr. 282. She described those changes as "degenerative arthritis on three compartments of my knee." *Id.* Plaintiff indicated a change in her daily activities of having to "struggle with cleaning up around my home due to severe pain." Tr. 286.

In a September 30, 2020 Disability Report-Appeal Plaintiff indicated a change in her medical condition that occurred in March 2020. Plaintiff noted that "the amount of weight that I can bare [sic] in my left leg has gotten worse and my doctors are talking about surgery on my left knee and left heel. My depressive symptoms ha[ve] increased drastically." Tr. 296. Plaintiff also noted a new condition as of May 2020 of major depression disorder-recurrent. *Id.* Plaintiff indicated a decrease in her daily activities because she has "been in severe pain and unable to move around much." Tr. 301. In the Remarks section of the report Plaintiff noted:

> I have the following medical and mental health diagnosis: Depression Anxiety PTSD Migraines sensorimotor polyneuropathy Pseudobulbar affect (PBA) bulging disc in spine Degenerative joint disease spinal stenosis High Blood pressure Abnormal EKG Hypertension heart palpitations Asthma Cataracts in both eyes[.]

Tr. 302.

### C.    The Administrative Proceedings

Plaintiff appeared, along with her attorney and a witness, for her administrative hearing on February 16, 2021, in Columbia, South Carolina. Tr. 30. Vocational expert ("VE") Barbara Hudson Azzam also appeared. *Id.* Due to the extraordinary circumstances of the coronavirus pandemic the hearing was conducted telephonically. Tr. 32.

#### 1.    Plaintiff's Testimony

In response to questions from the ALJ Plaintiff testified that she is 5'3" tall, weighed 180 pounds, graduated from high school, and last worked as a delivery driver for Papa John's in Camden. Tr. 36. Plaintiff stated that the heaviest thing she had to lift was a box of cheese that weighed 10-15 pounds. *Id.* Plaintiff disputed that she worked for Prudential from 2008-2010 and

testified that she was on long-term disability from her job at Howden Buffalo where she worked in the accounts receivable department as an invoicing specialist. Tr. 36-37. Plaintiff stated that she did not have to do any lifting or carrying with that job. Tr. 37. Plaintiff testified that she stopped working at Papa John's in December 2019 because her mental health counselor recommended that she take medical leave due to her physical issue of constant pain and her mental issues PTSD with increased anxiety flashbacks and recently added bipolar disorder. *Id.* Plaintiff elaborated that she has degenerative disc disease with two bulging discs in her cervical spine, degenerative changes in her left knee with cysts, bone spurs on the bottom of her left foot, and muscle cramping. Tr. 37-38. Plaintiff stated that doctors have not yet determined what is causing the muscle cramps, but she noted that in September 2019 she was diagnosed with sensorimotor polyneuropathy with demyelinating features. Tr. 38. Plaintiff stated that her feet and hands go numb, and she has tingling and burning sensations in her hands and feet now going into her legs. Plaintiff testified that she drops things constantly, and she has problems lifting her feet which causes her to trip. *Id.* Regarding her mental health issues, Plaintiff testified that she has had major depressive disorder and anxiety disorder since 2007, and she has PTSD with "almost daily flashbacks of [her] husband dying in front of [her]." Tr. 39. Plaintiff testified that she cannot be in large crowds of people, she is startled by loud noises, and if while driving she sees an emergency vehicle with sirens it triggers flashbacks. *Id.* Plaintiff stated she also has "PBA which is uncontrolled bouts of crying and laughter." *Id.* Plaintiff testified that she is on Xanax for anxiety, Latuda for the bipolar mood swings, Elavil for depression, three blood pressure medicines, a cholesterol medicine, migraine medications, muscle relaxers, pain medication, and Nuedexta for the PBA. *Id.* Plaintiff described side effects of the medications as tiredness and trouble concentrating. *Id.*

Plaintiff testified that in the past two years her pain has "gotten a lot worse," the numbness and tingling has gotten worse, and she is having to use a cane to help with walking and balance.

Tr. 40. Plaintiff stated that the cane was prescribed in December 2020. *Id.* Plaintiff testified that high blood pressure and migraines also affect her ability to work. She stated that with her medication, her migraines are "down to about one a week." *Id.* Plaintiff stated that when she has a migraine she has to "stay in a dark room, no sound, no noise[.]" Tr. 41. Plaintiff confirmed that she has asthma, and although she has a rescue inhaler, she does not have a nebulizer. *Id.* Plaintiff testified that she is able to dress herself and take care of her personal hygiene needs, but she has to sit down to perform some tasks, and she sometimes needs help with her hair because she is unable to lift her arm completely. *Id.* Plaintiff testified that she is able to wash a small load of clothes, wash a small number of dishes, and she "mostly cook[s] [her] food in the microwave or eat[s] sandwiches." Tr. 42. Plaintiff stated that she drives "[v]ery little" because of her anxiety and she has problems seeing after dark. *Id.* Plaintiff testified that she does her shopping online, including grocery shopping. *Id.* Plaintiff testified that she could sit for 20-30 minutes at one time before needing to stand up and move around. Tr. 42-43. She stated that she can stand for "about 15 to 20 minutes." Tr. 43. Plaintiff testified that she could walk from one end of her house to the other, and the heaviest weight she can lift would be a gallon of milk. *Id.*

In response to questions from her attorney Plaintiff testified that, with her medication, she is down to about one really bad migraine headache a week. Tr. 43. Plaintiff testified that she has problems sleeping—she has nightmares, and even with medication she has bouts of insomnia and is unable to sleep because her "brain don't shut down." *Id.* Plaintiff stated that lately she has been "getting about three to five hours of sleep, but then there's times that [she] may sleep anywhere from 8 to 12 hours." Tr. 44. Plaintiff stated on the days when she has had less sleep, she takes a one-to-two-hour nap. *Id.* Plaintiff testified that she has nightmares "[a]lmost nightly" and she has been diagnosed with restless leg syndrome. *Id.* Plaintiff also testified that about two years ago she began having problems with dizziness and that dizziness causes her to fall. *Id.* Plaintiff testified

that she understood that sensory polyneuropathy is "normally either caused from MS [multiple sclerosis] or from diabetes" and she tested negative for diabetes but doctors could not prove MS because she did not have any lesions on her brain or spine. Tr. 45. Plaintiff stated that she has not had a spinal tap performed to determine if she might be suffering from MS. *Id.* Plaintiff testified that she has one or two panic attacks a week triggered by "crowds of people, a lot of noise." *Id.* Plaintiff also stated that with her depression she has crying spells. *Id.* She testified that the medication for PBA has helped with the crying spells and she is not having them "quite as often." Tr. 46. Plaintiff stated that she had a crying spell before the hearing, and she has been crying during the hearing. *Id.*

Plaintiff testified that she has pain in her neck and back from degenerative disc disease and bulging discs. Tr. 46. She stated that she has pain on the bottoms of her feet and has a bone spur on her left heel, she has degenerative changes in her left knee, and she has a small cyst and ganglion cysts on both knees. *Id.* Plaintiff stated that her back pain and muscle pain varies from day to day. *Id.* She testified that "the last couple of days were like the muscles and all in the right side of [her] neck and [her] shoulder had been really tight where [she] can't lift [her] right arm completely up." Tr. 47. Plaintiff stated that her pain medication keeps her pain level "down to about a five or six" on a ten-point scale. *Id.* Plaintiff testified that a lumbar x-ray showed aortic calcifications and she will be tested in March about that. *Id.* She confirmed that she has had one or two abnormal EKGs and has heart palpitations and chest pain, but she noted that the pain could be from anxiety and panic attacks after having watched her husband die from a heart attack. Tr. 48.

2.    Lay Witness Testimony

Lay witness Joseph Elping, Plaintiff's 19-year-old son, testified. Tr. 48-49. In response to questions from the ALJ Mr. Elping stated that he did not live with his mother but he saw her two-to-three times a week. Tr. 49.

6

In response to questions from Plaintiff's counsel Mr. Elping stated that he has been living away from his mother for the past three months. Tr. 49. He stated that he has noticed his mother having signs or symptoms of pain. *Id.* He testified that when she holds anything "it has to have no weight. If she tries to hold it, her hand will cramp up that – where she either drops it or she can't let go of it. I have to pry her fingers open." *Id.* Mr. Elping testified that his mother cannot get up the stairs without help and "she has to take breaks and sit down if she's standing too long or if she's sitting too long, she won't be able to get up without help." *Id.* Mr. Elping stated that he has observed his mother having panic attacks and when he was living with her, she would have one about once a week. Tr. 50. He testified that some days his mother would have crying spells two or three times a day, but "a couple of days here and there she won't have any[.]" *Id.* He stated that his mother has mood swings that "can change within a blink of an eye" if triggered. Tr. 50-51. He stated that before she started using a cane his mother "would lose her balance a lot." Tr. 51.

### 3. VE's Testimony

VE Barbara Hudson Azzam testified at Plaintiff's administrative hearing. Tr. 51. She described Plaintiff's past work as outside deliverer, Dictionary of Occupational Titles ("DOT") number 230.663-010, light, with a specific vocational preparation ("SVP") of two, unskilled; and accounting clerk, DOT number 216.482-010, sedentary, SVP of five, skilled. Tr. 53.

The ALJ asked the VE to consider a person of Plaintiff's age, education, and PRW with the following residual functional capacity:

> She can lift and carry ten pounds occasionally/less than ten pounds frequently; she can sit for six hours in an eight-hour shift; she can stand for two hours and walk for two hours; she can frequently handle and finger objects bilaterally; . . . she could occasionally climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; she must use a handheld assistive device for all ambulation and can use the other arm to lift and carry up to the exertional limits; she can have occasional exposure to extreme cold, extreme heat, to moisture and humidity and to irritants such as odors, fumes, dust, gases, and poor ventilation; she can do work equivalent to level 2 reasoning development,

but she would be limited to making simple work-related decisions and limited to environments in where there were only routine changes in the work settings and duties; she can have occasional interaction with coworkers and no interaction with the general public; she would need to be off task 5% of the workday in additional [sic] to regularly-scheduled breaks.

Tr. 53-54. The ALJ asked if an individual with these limitations could perform Plaintiff's PRW and the VE responded that it "precludes all past work." Tr. 54. The VE testified that there would be other jobs that existed in the national economy that the individual could perform and identified the following sedentary, unskilled work at an SVP level two: document scanner, DOT number 249.587-018, more than 300,000 in the national economy; inspector, representative DOT number 669.687-014, more than 200,000 in the national economy; and table worker, representative DOT number 739.687-018, more than 100,000 in the national economy. Tr. 54. The VE withdrew the document scanner job from consideration due to the restriction on the GED level and substituted assembler, representative DOT number 734.687-018, more than 300,000 in the national economy. Tr. 55.

The ALJ's second hypothetical included the same capabilities in the first hypothetical except "the off-task time would increase from 5% to 20%." Tr. 55. The VE testified that would preclude all work activity because most employers would not tolerate more than 10% off task. *Id.* The VE confirmed her testimony was consistent with the DOT but factors not addressed by the DOT such as off task were based on her training and experience. *Id.*

Plaintiff's counsel asked if the positions identified would be eliminated if the individual could only handle and finger 10% of the time. Tr. 56. The VE testified that "there are virtually no jobs which would be able to accommodate only 10% use of both upper extremities. *Id.* Counsel referred the VE to Exhibit 13F[3] and asked would an individual be able to perform any jobs in the

---

[3] Exhibit 13F is a January 11, 2021 Medical Opinion Re: Ability to do Work-Related Activities (Mental). Tr. 514-16. The signature of the author is illegible. Tr. 515.

economy with the following limitations:

> If an individual is unable to remember work-like procedures and on a competitive basis is unable to carry out very short and simple instructions . . . and would not meet competitive standards and would not be able to follow an ordinary routine without special supervision, could not make simple work-related decisions, could not perform at a consistent pace without an unreasonable number and length of rest periods, and could not respond appropriately . . . to changes in a routine work setting, and could not deal with normal work stress[.]

*Id.* The VE testified this would preclude all work including all past work. Tr. 56-57.

## II.  Discussion

### A.    The ALJ's Findings

In his March 16, 2021 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2.    The claimant has not engaged in substantial gainful activity since December 11, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease, asthma, neuropathy, degenerative joint disease left knee, major depressive disorder, generalized anxiety disorder, personality disorder and PTSD (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except lifting and carrying 10 pounds occasionally and less than 10 pounds frequently; sitting for 6 hours, standing for 2 hours, and walking for 2 hours. She must use a handheld assistive device for all ambulation and the other hand can be used to lift and carry up to the exertional limits. She can push/pull as much as can lift/carry, and can handle and finger objects frequently bilaterally. She can balance, stoop, kneel, crouch, and crawl occasionally, and climb ramps, stairs, ladders, ropes, and scaffolds occasionally. The claimant can work in

humidity and wetness, in dust, odors, fumes, pulmonary irritants, in extreme cold, and in extreme heat occasionally. She can perform work equivalent to Level 2 Reasoning Development, and is limited to making simple work-related decisions. She is able to interact with coworkers occasionally, but can never interact with the public. She is limited to environments in which there are only routine changes in the work setting and duties. The claimant will need to be off task 5 percent of time in an 8-hour workday in addition to regularly-scheduled breaks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on December 27, 1975 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 11, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 15-18, 22-24.

B. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

A claimant is not disabled within the meaning of the Act if the claimant can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing the inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish the inability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146 n.5 (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d

12

846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

Plaintiff argues (1) the ALJ did not explain his findings regarding her residual functional capacity ("RFC") as required by SSR 96-8p, and (2) the ALJ improperly evaluated Plaintiff's subjective symptomology. Pl.'s Br. 14, 24; ECF No. 15. The Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff had the RFC to perform sedentary work with additional limitations and considered Plaintiff's subjective statements. Def.'s Br. 1, ECF No. 17.

1.    The ALJ's RFC Determination

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but

the *most.*" *Id.* (emphasis in original). At the administrative hearing level the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c); § 416.946. An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3)-(4); § 416.945(a)(3)-(4).

The Administration's policy interpretation on assessing an individual's RFC emphasizes that the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1. The functions identified in the cited regulations include physical abilities, mental abilities, and other abilities affected by impairments. 20 C.F.R. § 404.1545(b)-(d); § 416.945(b)-(d).

Here, at Step Two of the sequential evaluation process, the ALJ determined that Plaintiff had the severe impairments of degenerative disc disease, asthma, neuropathy, degenerative joint disease left knee, major depressive disorder, generalized anxiety disorder, personality disorder and PTSD. Tr. 15. Further, the ALJ found Plaintiff has the following non-severe impairments: obesity, cataract, hypertension, paresthesia of the skin, mild sleep apnea, tinnitus, restless leg syndrome, and irritable bowel syndrome with occasional diarrhea. *Id.* The ALJ determined that Plaintiff's PBA is not a medically determinable impairment. Tr. 16. At Step Three the ALJ determined that Plaintiff does not have an impairment, or combination of impairments, that meets or medically equals the severity of a listed impairment. Tr. 16-17.

The ALJ determined that Plaintiff has the RFC to perform sedentary work as defined in 20 CFR § 404.1567(a) and § 416.967(a) with several physical and mental limitations. Tr. 17-18. The

ALJ noted that in making his RFC assessment he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." Tr. 18. The ALJ also indicated that he considered the opinion evidence and prior administrative findings in accordance with the regulations. *Id.*

Plaintiff asserts that the ALJ did not explain his RFC findings as required by SSR 96–8p which provides:

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Pl.'s Br. 14 (quoting SSR 96-8p, 1996 WL 374184, at *7). The court notes, though, that ALJs are not required to specifically discuss and analyze every piece of evidence in the case in their narrative opinions so long as it is possible for the reviewing court to realize that all relevant evidence was considered, though not written about, in reaching the ultimate decision. *Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004) ("[T]he ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it."); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (finding that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection" insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole).

Plaintiff argues that the ALJ did not consider all of her physical and mental impairments on a function-by-function basis to determine how they affect her ability to work as required by

SSR 96-8p and as set forth in *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019) (finding that a proper RFC analysis has three components: evidence, logical explanation, and conclusion). Pl.'s Br. 15. Plaintiff contends the ALJ failed to properly consider her migraine headaches, her mental impairments, and her spine disorder and neuropathy.

a.    Plaintiff's Migraine Headaches

Plaintiff argues that the ALJ failed to consider her migraines as a severe or non-severe impairment and "the ALJ's RFC findings are deficient because he failed to properly evaluate the impact of [Plaintiff's] headaches on her ability to work." Pl.'s Br. 16.  The Commissioner asserts that substantial evidence supports the ALJ's consideration of Plaintiff's headaches. Def.'s Br. 12. The Commissioner contends that the ALJ concluded that Plaintiff's headaches were non-severe; however, the ALJ did not make such a determination. As noted above, at Step Two the ALJ identified several severe and non-severe impairments, and even noted one diagnosis that he found not to be a medically determinable impairment. He did not identify Plaintiff's headaches as an impairment at Step Two.

In his discussion of his RFC assessment, the ALJ noted Plaintiff's testimony that "[s]he has migraines once per week." Tr. 18. Plaintiff's actual testimony was that "[w]ith the medication, I'm down to about one a week." Tr. 40. At the hearing the ALJ asked Plaintiff to describe her migraines and she testified that "it'll feel like somebody has hit me in the back of the head with a baseball bat. I have to stay in a dark room, no sound, no noise . . . ." Tr. 40-41.

Defendant argues that the ALJ's reference to certain medical records is substantial evidence that "supports the ALJ's consideration of Plaintiff's headaches[.]" Def.'s Br. 13. In his discussion of Plaintiff's impairments and treatment records the ALJ noted that "[a]lthough, she has also reported waking with headaches frequently, she reported they are amenable to medication (Ex. B14F/25), with neurology records indicating periods where she only experienced one over

several months (Ex. B5F/1)." Tr. 19. The first record the ALJ cites to (Ex. B14F/25) is a May 11, 2020 treatment record from Midlands Neurology & Pain Associates when Plaintiff stated that "her headaches are manageable with the prescribed medication. Patient usually wakes up with headaches frequently. Patient states that headaches are 5-7/10 on pain scale when she has an onset." Tr. 541. The second record cited to by the ALJ (Ex. B5F/1) is also a record from Midlands Neurology & Pain Associates and was Plaintiff's initial consultation on August 30, 2019. Tr. 414. The record reported the following symptoms:

> She was in apparent good health until 9 months ago when she started experiencing headache. No prior history of trauma. She notes that the headache originates from the occipital region and radiates to the frontal region. Headache is pounding and throbbing in nature. She notes the headache occurs daily and lasts all day. There is associated dizziness such that she loses balance at times. There is also associated nausea, vomiting[,] hypersensitivity to light and sound, blurry vision, double vision, tinnitus (both ears), and she snores. . . . She is on fiorecet and imitrex 50mg for the headache but she is not getting any relief.

Tr. 414-15. The actual information in this treatment record is different from the ALJ's interpretation that she "only experienced one [headache] over several months." Tr. 19. The ALJ also cites to a December 4, 2019 MRI brain study that noted "no abnormalities (Ex. B6F/2)."[5] *Id.* The ALJ does not allude further to Plaintiff's headaches in his decision, nor does he indicate that he took Plaintiff's headaches into consideration in formulating his RFC assessment. To the extent that Defendant is arguing that this evidence supports the ALJ's consideration of Plaintiff's migraines in formulating his RFC assessment, the court does not find this to be a persuasive argument. Other than these few statements, the ALJ's decision does not include any analysis as to the impact of Plaintiff's headaches on her ability to function.

---

[5] The ALJ does not offer any explanation as to why the 2019 MRI is significant to his consideration of Plaintiff's headaches.

In support of her argument that the ALJ "failed to fully explain his RFC findings[,]" Plaintiff cites to several instances in the record where she complained of and was treated for headaches and contends that her headaches "more than minimally impacted [her] ability to work." Pl.'s Br. 16-18. These include treatment records from Sandhills Medical from December 2018 to December 2019, *see* ex. B4F at Tr. 372 (list of patient encounters indicating diagnoses for migraine headache and migraine with vertigo); treatment records from Midlands Neurology & Pain Associates from September 2019 to August 2020, ex. B14F at Tr. 517-557 (indicating diagnoses and treatment for migraines); and treatment records from Midlands Neurology & Pain Associates from September 2020 to February 2021, ex. B15F at Tr. 561-580 (same).

The Commissioner argues that the ALJ accounted for Plaintiff's headaches and any limitations arising therefrom by limiting her to work with "level two reasoning development, simple work-related decisions, only routine changes in the work setting, and 5% off-task time[.]" Def.'s Br. 14. However, in his decision the ALJ never indicated that these limitations in his RFC assessment were attributable to concessions made because of Plaintiff's headaches. In fact, the ALJ specifically noted that "limitations to work equivalent to Level 2 Reasoning Development, simple work-related decisions, and only routine changes in work setting and duties" were made to account for the "benefits of stress reduction on her overall outlook as evidenced in the record[.]"[6] Tr. 22. To the extent the Commissioner argues that the ALJ accounted for Plaintiff's headaches in his RFC assessment such post-hoc rationalization is not sufficient when the ALJ failed to articulate these findings in his decision. *See Radford v. Colvin*, 734 F.3d 288, 294 (4th Cir. 2013) (rejecting

---

[6] The ALJ also explained the reasons for his other RFC limitations and noted the postural and environmental limitations in the RFC were made to account for Plaintiff's degenerative disc disease, degenerative joint disease, asthma, and neuropathy; limitations regarding use of her bilateral upper extremities were made to account for her history of neuropathy; and the social limitations of no interaction with the public and only occasional interaction with co-workers were made to account for Plaintiff's PTSD, personality disorder, anxiety, and depression. Tr. 22.

Commissioner's argument in part because it consisted of "a post[-]hoc rationalization") (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)); *Alexander v. Colvin*, No. 9:14–2194–MGL–BM, 2015 WL 2399846, at *6 (D.S.C. May 19, 2015) (rejecting Commissioner's argument as "only a post[-]hoc rationalization for upholding the decision, since that is not actually what the ALJ did").

The ALJ's decision lacks any discussion of whether Plaintiff's headaches would require additional RFC limitations. By not including this discussion in his decision, the Commissioner fails to show how the ALJ supported his decision with substantial evidence. In *Mascio v. Colvin*, the Fourth Circuit addressed whether an ALJ's failure to perform a function-by-function assessment necessitates remand. *Mascio v. Colvin*, 780 F.3d 632, 636-37 (4th Cir. 2015). The court held that "a per se rule [requiring remand] is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" *Id.* at 636. Nevertheless, the court "agree[d] with the Second Circuit that '[r]emand may be appropriate . . . *where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.*'" *Id.* (emphasis added). The ALJ's lack of explanation and analysis of Plaintiff's migraine headaches frustrates meaningful review. Accordingly, remand is appropriate so that the ALJ may provide a clearer explanation of his consideration of Plaintiff's migraines and the effect, if any, on her functioning and work-related abilities.[7]

  b. Plaintiff's Mental Impairments

---

[7] The court expresses no opinion as to whether Plaintiff's headaches would result in additional limitations to her RFC. However, without consideration from the ALJ on this issue, the court is unable to undertake meaningful review of the decision.

Plaintiff asserts the "ALJ does not adequately explain why he found [she] could occasionally interact with coworkers but never the general public." Pl.'s Br. 20. The Commissioner contends that substantial evidence supports the ALJ's evaluation of Plaintiff's mental impairments and explained his findings regarding Plaintiff's ability to occasionally interact with coworkers but have no interaction with the public. Def.'s Br. 15-16.

At Step Three of the sequential evaluation the ALJ evaluated Plaintiff's mental impairments and determined that Plaintiff had moderate limitation in the area of interacting with others. Tr. 17. The ALJ explained:

> The claimant endorses preferring to stay at home and an inability to be around crowds (Testimony). However, her Function Report shows she is able to drive, and shops in stores, but is in and out (Ex. B3E/4). She has reported fishing with her neighbor and living with a friend in November 2020 (Ex. B14F/17). However, she has endorsed mood swings at times that would suggest moderate limitations in interacting with others.

*Id.*

In his RFC assessment the ALJ determined that Plaintiff "is able to interact with coworkers occasionally, but can never interact with the public." Tr. 18. The ALJ cited to Plaintiff's testimony from the administrative hearing and noted:

> She has bipolar disorder, anxiety, and PTSD. She has flashback of her husband dying in front of her from a heart attack. She does not like large crowds or loud noises. She has uncontrolled crying and laughing spells. . . . Her anxiety prevents her from being in large crowds and she is easily startled when she hears a loud noise.

*Id.* The ALJ considered the opinions of the State agency consultants that Plaintiff could "respond appropriately to supervision, co-workers and the public" unpersuasive finding that Plaintiff's "mental impairments, although not disabling, further limit her ability to interact with the public." Tr. 21. The ALJ concluded that his "RFC accounts for [Plaintiff's] social limitations due to a desire to avoid crowds with the additional limitation to no interaction with the public, and only occasional

interaction with co-workers as part of her assigned job duties." Tr. 22. Here, the ALJ explained why he determined Plaintiff had moderate limitations in interacting with others and how it would impact Plaintiff's functioning.

Plaintiff contends that a January 2021 medical source statement from Kershaw Mental Health Clinic supports her assertion that her "mental impairments, especially when considered in combination, would likely result in [her] being off task or unable to concentrate for a considerable portion of the workday." Pl.'s Br. 21. Plaintiff argues the ALJ "fails to explain the relatively moderate work restrictions in the context of medical evidence suggesting much more debilitating mental impairments and an opinion from a treating source indicating extreme mental impairments that would clearly preclude all competitive work activity." *Id.* The Commissioner argues that substantial evidence supports the ALJ's consideration of this opinion under the new regulatory framework[8] for evaluating medical opinions. Def.'s Br. 16.

The ALJ evaluated this opinion and determined as follows:

The record also contains a medical opinion from Kershaw Mental Health endorsed by Vicki Dashio dated January 2021 (Ex. B13F/1-2). She opined the claimant had no useful ability to function in 2 categories including being able to maintain regular attendance and being able to complete a normal workday and workweek without interruptions from psychologically based symptoms. She further opined the claimant would be unable to meet competitive standards in 7 categories[9] including

---

[8] Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or give special deference to treating source opinions. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, ALJs consider medical opinions using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with the other evidence in the claim or understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). The first two factors, supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion, and the ALJ is not required to explain the consideration of the other three factors. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

[9] These seven categories included the ability to (1) remember work-like procedures, (2) maintain attention for two-hour segment, (3) sustain an ordinary routine without special supervision, (4) make simple work-related decisions, (5) perform at a consistent pace without an unreasonable

[sic] and was seriously limited but not prohibited in 6 other categories[10] and anticipated the claimant would be absent from work more than 4 days per month.  I find this opinion unpersuasive. While the claimant's representative's brief indicates Ms. Dashio is a treating provider, the record contains no mental health records from Ms. Dashio, nor does this opinion provide any indication of this professional's mental health training.  Further, Ms. Dashio's opinion consist of a series of checked boxes on a form, without further explanation or supporting evidence. Lauretta Mona, MSN, APRN, is the only mental health provider of record and her treatment records do not show mental status examination findings that would support such extreme limitations as set forth in this opinion.

Tr. 21.

When discussing the finding about the persuasiveness of an opinion, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ's discussion of this opinion indicates that he found it lacked supportability because "the record contains no mental health records" from the author of the opinion, nor is there any information regarding the author's mental health training. Tr. 22. Additionally, the ALJ noted that there was no explanation or supporting evidence provided for the "series of checked boxes on a form[.]" *Id.* Checkbox forms lacking explanation are considered weak evidence. *See Roof v. Saul*, No. CV 5:19-1571-MGL-KDW, 2020 WL 3549206, at *11 (D.S.C. June 23, 2020), *adopted*, 2020 WL 3548814 (D.S.C. June 30, 2020) (collecting cases). The ALJ also found the opinion inconsistent with "the only mental health provider of record" whose treatment notes did not support the extreme limitations in the January 2021 opinion.

---

number and length of rest periods, (6) respond appropriately to changes in a routine work setting, and (7) deal with normal work stress. Tr. 514.

[10] These six categories included the ability to (1) understand and remember very short and simple instructions, (2) carry out very short and simple instructions, (3) work in coordination with or proximity to others without being unduly distracted, (4) accept instructions and respond appropriately to criticism from supervisors, (5) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and (6) be aware of normal hazards and take appropriate precautions. Tr. 514.

The responsibility for weighing evidence falls on the Commissioner, not the reviewing court. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). In undertaking review of the ALJ's treatment of a claimant's medical sources, the court focuses its review on whether the ALJ's decision is supported by substantial evidence. As required by the regulations, the ALJ considered the persuasiveness of the opinions contained in the January 2021 medical opinion from Kershaw Mental Health applying the factors of supportability and consistency. 20 C.F.R. §§ 404.1520c(b)-(c), 416.920c(b)-(c). Therefore, in reviewing the decision and paying particular attention to the ALJ's discussion of Plaintiff's moderate mental limitations and the physician opinions, the court does not find reversible error in the ALJ's evaluation of Plaintiff's mental impairments for the RFC assessment.

### c. Plaintiff's Spine Disorder and Neuropathy

Plaintiff argues that the ALJ's RFC findings "failed to properly account for the severity of [her] symptoms." Pl.'s Br. 22. Plaintiff contends her diagnosis of polyneuropathy with demyelinating features is inconsistent with the ALJ's finding that she would be capable of frequent handling and fingering. *Id.* Plaintiff also contends that evidence of her back pain is "inconsistent with the prolonged sitting required by sedentary work, and the ALJ['s] rationale fails to adequately explain the ALJ's finding that [Plaintiff] could perform prolonged sitting without the need to change positions." *Id.* at 23. The Commissioner asserts that "[s]ubstantial evidence supports the ALJ's evaluation of Plaintiff's spine disorder and neuropathy." Def.'s Br. 18.

At Step Two the ALJ determined Plaintiff's severe impairments included degenerative disc disease and neuropathy. Tr. 15. At Step Three he considered whether Plaintiff's degenerative disc disease met or medically equaled the severity of Listing 1.04, disorders of the spine, and determined it did not. The ALJ found that:

the claimant does not have nerve root compression or neurological deficits that are reflected by motor loss, reflex loss or sensory loss. She does not have spinal arachnoiditis. Finally, there is no indication that she cannot ambulate effectively. (See, e.g., Ex. B14F, B15F). In regards to Listing 1.04, I have also considered Acquiescence Ruling 15-1(4), and find no continuous 12 month period in which all of the medical criteria were present.

Tr. 16. In his RFC assessment the ALJ limited Plaintiff to sedentary work with sitting for six hours, standing for two hours, and walking for two hours. Tr. 18. He included Plaintiff's use of a handheld assistive device for all ambulation, noting that her other hand could be used to lift and carry up to the exertional limits. *Id.* He determined plaintiff could "push/pull as much as can lift/carry, and can handle and finger objects frequently bilaterally." *Id.*

In his discussion of Plaintiff's testimony from the administrative hearing, the ALJ noted her testimony that "[s]he has neuropathy in her hands and feet but there as been no diagnosis. She drops things a lot due to grip problems." Tr. 18. Plaintiff also reported "tripping 'a lot.'" *Id.* The ALJ also noted Plaintiff's testimony that "her physical impairments limit her to standing 15-20 minutes, and sitting 20-30 minutes. She [is] able to walk from room to room in her home and can lift a gallon of milk." Tr. 19. The ALJ further noted the testimony of Plaintiff's son who "testified his mother has trouble holding things and he has to pry her hands open. He helps her climb the stairs. If she sits too long she cannot get up out of the chair without assistance." *Id.*

The ALJ discussed Plaintiff's impairments and noted that she "suffers from cervical degenerative disc disease, degenerative joint disease, and peripheral neuropathy." Tr. 19. The ALJ cited to a March 2013 nerve conduction study that was "consistent with the diagnosis of possible mild motor peripheral neuropathy, and no evidence of nerve impingement or radiculopathy; a December 2019 MRI "noting 1mm ventral bulging disc at C5-C6 with no herniation or spinal stenosis, and a 1mm ventral bulging disc at C6-C7 with borderline spinal stenosis and no disc

herniation (Ex. B6F/1)"[;] and a May 2020 lumbar MRI that was "unremarkable (B6F/3)." *Id.* The

ALJ acknowledged the following reports made by Plaintiff:

> The claimant endorses pain in her head, neck, and upper back worsened by movement, as well as numbness and tingling into her fingers, leg and feet associated with her cervical degenerative disc disease, degenerative joint disease, and neuropathy (Ex. B5F, B9F, B14F, B15F). Midlands Neurology and Pain Associates have treated these impairments since August 2019 (Ex. B5F/1). . . . While the claimant's subjective complaints have varied in degree overtime, examinations throughout the record have remained consistent noting a cervical strain pattern with limited cervical range of motion, and tenderness to palpitation of the cervical spine (*See, e.g.*, Ex. B5F/3, 21; B9F/7, 17; B14F/18, 23; B15F/5).

Tr. 19. The ALJ further noted that despite Plaintiff's reports of pain and numbness, her

"[e]xaminations are otherwise unremarkable noting normal gait, normal stance, normal swing

phase with no antalgic component, normal lumbar and thoracic range of motion, normal upper and

lower extremity range of motion, normal coordination in the upper and extremities, 5/5 motor

strength in both upper and lower extremities, and normal sensory and normal deep tendon reflexes

in the lower extremities." *Id.* (citing *e.g.*, Ex. B5F/3, 21; B9F/7, 17; B14F/18, 23; B15F/5).

As the ALJ continued to discuss Plaintiff's treatment records, he further indicated these

records showed limited objective findings to support Plaintiff's alleged limitations, again citing to

examinations noting "stable, normal gait, normal upper and lower extremity range of motion, 5/5

motor strength in all extremities, and intact reflex and sensory findings." Tr. 21. The ALJ noted

that Plaintiff's use of a cane was not reflected in the neurologist treatment records, neither did

these records indicate Plaintiff was unable to lift her arms or legs. *Id.* The ALJ discussed other

treatment records indicating Plaintiff participated in activities such as fishing and camping, and

caring for her mother who had cancer. *Id.* The ALJ concluded these reports "stand in contrast to

her limited ability to sit, stand or walk any substantial time or distance." *Id.*

The ALJ disagreed with the opinions of the State agency consultants who determined

Plaintiff could perform a range of medium work, instead finding that her "cervical degenerative

disc disease, degenerative joint disease, and neuropathy clearly limit her to less than medium work[.]" Tr. 21. The ALJ stated he accounted for these impairments in his RFC with "additional postural and environmental limitations." Tr. 22. The ALJ further stated that "while not fully supported by the record, I have also allowed for use of a cane as testified to by the claimant. Likewise, limitations to frequent use of the bilateral upper extremities to handle and finger fully accommodate her history of neuropathy to the extent allowed by the objective findings of record." *Id.*

The issue is whether there is substantial evidence to support the ALJ's decision that Plaintiff's spine disorder and neuropathy do not preclude her from performing a range of sedentary work. The ALJ's analysis of the evidence provides a logical bridge between the evidence and his RFC findings. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016). Although Plaintiff testified that she had been diagnosed with polyneuropathy with demyelinating features, Tr. 38, the administrative records do not provide a treatment record with this diagnosis. Instead, as cited by Plaintiff in her brief, there are records indicating Plaintiff's statements to treatment providers other than her neurologist that she had been diagnosed with this impairment. *See* Pl.'s Br. 22 (citing to treatment records from Providence Heart, Sandhills Medical, and Kershaw County Mental Health). None of the records from Midlands Neurology indicate a diagnosis of polyneuropathy with demyelinating features. *See* treatment records dated 8/30/19 to 4/13/2020, Tr. 414-44; treatment records dated 6/8/2020 to 8/3/2020, Tr. 480-98; treatment records dated 9/30/19 to 8/3/20, Tr. 517-57; and treatment records dated 9/20/2020 to 2/2/2021, Tr. 558-80. Notably, the records from Midlands Neurology indicate Plaintiff's lumbar range of motion, upper and lower extremities range of motion, motor, and coordination were all within normal limits. *See id.* The court finds that the ALJ evaluated the medical evidence of record related to Plaintiff's spinal impairments and, based on the evidence as a whole, he assessed Plaintiff's RFC. Accordingly, the ALJ's RFC

assessment regarding Plaintiff's capabilities based on her spine disorder and neuropathy is supported by substantial evidence.

### 2.    Evaluation of Plaintiff's Subjective Symptomology

In her final argument Plaintiff asserts that the ALJ did not properly evaluate her subjective symptomology. Pl.'s Br. 24. Plaintiff argues that the ALJ failed to consider treatment notes indicating worsening depression and ignored the cyclical nature of mental health symptoms that may have impacted her ability to work. *Id.* at 26-28. The Commissioner contends that substantial evidence supports the ALJ's consideration of Plaintiff's subjective complaints, and he "engaged in a comprehensive discussion of the medical and other evidence of record and then proceeded to assess the record evidence and Plaintiff's subjective statements (Tr. 17-22)." Def.'s Br. 22-23.

SSR 16-3p provides a two-step process for evaluating an individual's symptoms. First, the ALJ must determine whether the individual has a medically determinable impairment "that could reasonably be expected to produce the individual's alleged symptoms." SSR 16-3p, 2017 WL 5180304, at *3. In the second step the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities . . .." *Id.* at *4.

The ALJ considered Plaintiff's subjective statements by using the two-step process outlined above. The ALJ discussed Plaintiff's and her son's hearing testimony regarding her mental health symptoms. Tr. 18-19. The ALJ addressed Plaintiff's mental health diagnoses and treatment noting both improvements and worsening in her moods. Tr. 20. Despite noting that in 2020 the treatment notes reflected anxious moods, increased nightmares and restlessness, mood swings and greater depression, Tr. 20, the ALJ found that the "clinical picture reflected in these treatment records show limited objective findings to support the disabling limitations the claimant alleges[,]" Tr. 21.

Reviewing the record and applicable law, the court finds that the ALJ's decision reflects that he followed the two-step process in evaluating Plaintiff's symptoms. The ALJ also pointed to evidence in the record to support his conclusion. However, he also pointed to evidence that supported Plaintiff's subjective statements regarding her anxiety and depression. Because the undersigned recommends remand based on the ALJ's lack of explanation regarding Plaintiff's migraine headaches, the ALJ should take the opportunity to revisit the record evidence regarding Plaintiff's subjective symptomology.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine if the Commissioner's entire decision is supported by substantial evidence. The court hereby reverses the decision of the Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g) and remands the matter to the Commissioner for further proceedings consistent with this Order.

IT IS SO ORDERED.

February 9, 2023                                 Kaymani D. West
Florence, South Carolina                         United States Magistrate Judge